## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHARON HARRIS,            \*

                                 \*

v.                      \*          Civil No. CCB-19-3251

                                 \*

NATIONSTAR MORTGAGE LLC, and  \*

SETERUS, INC.               \*

                                 \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM

Sharon Harris filed suit against Nationstar Mortgage LLC ("Nationstar") and Seterus, Inc. ("Seterus"), alleging: (1) violations of Maryland's Consumer Debt Collection Act ("MCDCA") (against Nationstar and Seterus); (2) violations of the Real Estate Settlement Procedures Act ("RESPA") and its implementing regulations (against Nationstar); and (3) violations of the Maryland Mortgage Fraud Protection Act ("MMFPA") (against Nationstar and Seterus). Harris also seeks declaratory judgment.

As of February 28, 2019, Seterus merged with Nationstar, and no longer exists as a separate legal entity. (ECF 9 at 1 n.1). Now pending is Nationstar's motion to dismiss for failure to state a claim, which it filed on behalf of itself and as successor by merger to Seterus. (ECF 9). Harris opposes the motion, (ECF 13), and Nationstar has replied, (ECF 14). The motion has been fully briefed and no oral argument is necessary. For the reasons explained below, the motion will be granted in part and denied in part.

### BACKGROUND

Harris resides at and is the owner of 2046 Linden Avenue, Unit B, Baltimore, MD 21217 (the "Harris Property"). (Compl. ¶¶ 12, ECF 3). The Harris Property is part of a duplex. Unit A, the other half of the duplex, is owned by Queene Stoops. (*Id*. ¶ 23). When Harris initially

purchased Unit B, she became a member of the Linden-Rialto Condominium Association (the "Condominium Association"), of which the owner of Unit A was also a member. (*Id.* ¶ 24). Because the duplex had a single water meter for all water supplied to Units A and B, Harris and the owner of Unit A paid portions of the total water bill monthly charges to the Condominium Association. (*Id.* ¶ 25). In turn, the Condominium Association was supposed to have remitted those amounts to the City of Baltimore, which operates the water system. (*Id.*). The Condominium Association failed to do so. (*Id.*). On October 3, 2014, the Condominium Association forfeited its corporate charter. (*Id.*).

On September 25, 2017, the City of Baltimore (the "City") commenced a civil action against both Stoops (as the owner of Unit A) and Harris (as the owner of Unit B) to collect the unpaid water bill charges. (Compl. ¶ 26). The City claimed that the total unpaid water bill charges attributable to the duplex (Units A and B combined) was $16,900.89. (*Id.*). On January 11, 2018, Harris, Stoops, and the City entered into a settlement agreement by which Harris and Stoops agreed to each take responsibility for 50 percent of the outstanding water bill charges. (*Id.* ¶ 27). The City further agreed that "If each Debtor pays $5,000.00 towards their share of the arrears set forth above, without breaching this agreement, the City shall abate the balance of their share of their arrears at that time." (*Id.*). After this settlement, Harris timely made payments with the goal of paying a total of $5,000.00. (*Id.*).

*      *      *

On or about August 27, 2004, Harris entered into a 30-year refinance mortgage with a loan arranged by American Home Mortgage on behalf of Fannie Mae (the "Harris Loan"). (Compl. ¶ 22). The Harris Loan was used for personal, consumer purposes related to the Harris Property. (*Id.* ¶¶ 12, 22). The Deed of Trust states, in relevant part:

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this [Deed of Trust.] . . . Borrower shall promptly discharge any lien which has any priority over this [Deed of Trust.]

[. . .]

**9. Protection of Lender's Interest in the Property and Rights Under this [Deed of Trust].** If [] Borrower fails to perform the covenants and agreements contained in this [Deed of Trust], . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this [Deed of Trust.] . . . Lender's actions can include, but are not limited to, [] paying any sums secured by a lien which has priority over this [Deed of Trust.]

(Deed of Trust ¶¶ 4, 9, ECF 9-2).[1]

Further, in a section titled "Funds for Escrow Services," the Deed of Trust provides:

Borrower shall pay to Lender on the day Periodic Payments are due under the Note,[2] until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: [] taxes and assessments and other items which can attain priority over this [Deed of Trust] as a lien or encumbrance on the Property[.] . . . These items are called "Escrow Items." . . . Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. . . . Borrower's obligation to make such payments . . . shall for all purposes be deemed to be a covenant and agreement contained in this [Deed of Trust], as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender my exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay Lender any such amount.

[. . .]

If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify [Harris] as required by RESPA, and [Harris] shall pay to Lender the

---

[1] Although not attached to the Complaint, the court takes judicial notice of the Deed of Trust, which was publicly filed in Maryland's land records. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record." (citation omitted)). Harris does not appear to object to the court's taking judicial notice of this document, as she references the Deed of Trust in her opposition to the motion to dismiss and makes arguments about what the language requires. (Opp'n at 8–10, ECF 13).

[2] As defined by the Deed of Trust, the "Note" "means the promissory note signed by [Harris] and dated August 27, 2004[.] The Note states that [Harris] owes Lender Thirty Thousand and No/100." (Deed of Trust at p. 2, ECF 9-2).

3

amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

(*Id.* ¶ 3).

According to a City of Baltimore Tax Sale Work Record, the Harris Property was advertised for a tax sale to occur on May 15, 2017. (ECF 13-2 at 5).[3] The Work Record notes that the "total liens" on the property were $16,402.91. (*Id.*).[4]

In August 2018, Seterus—the servicer of the Harris Loan—paid $16,402.91 to the City "apparently . . . based on its reckless belief that Ms. Harris owed this total amount for the total unpaid water bill charges to both Unit A and Unit B[.]" (Compl. ¶¶ 29–30). Shortly thereafter, Seterus sent Harris a document entitled "New Mortgage Payment Notice and Escrow Account Disclosure Statement" (the "Notice"). (*Id.* ¶ 31). The Notice informed Harris that as of October 1, 2018, her regular monthly payment on the Harris Loan would be increased from $325.36 to $1,102.57. (*Id.*).

In October 2018, shortly after receiving the Notice, Harris called Seterus's customer service group and advised them that 2046 Linden Avenue was a duplex and that the water bill charges were for two units. (Compl. ¶ 32). Through counsel, Harris informed Seterus about her settlement agreement with the City by a letter dated November 26, 2018. (*Id.* ¶ 35). Nevertheless, Harris made the "inflated" monthly payments from November 2018–June 2019. (*Id.* ¶¶ 33, 48).

---

[3] The court may take judicial notice of the Tax Sale Work Record, which is a public record and attached both to Nationstar's motion to dismiss and to Harris's opposition. *See Philips,* 572 F.3d at 180. Harris claims that Nationstar's copy of the Work Record (ECF 9-3) is incomplete and thus fails to meet the standard for a public record. (Opp'n at 11). Harris attaches her own copy of the Work Record (ECF 13-2 at 5). Nationstar concedes that its copy is "missing the very far right edge of text," but that Harris's copy is "the exact same document." (Reply at 5 & n.2, ECF 14). The court assumes, then, that Harris believes her copy of the Work Record meets the standard for a public record and does not object to the court taking judicial notice of it.

[4] The parties dispute whether a tax sale actually occurred. The Tax Sale Work Record indicates that the Harris Property was sold to the Mayor and City Council of Baltimore, (ECF 13-2 at 5), but Harris maintains that no tax sale occurred. (Opp'n at 11; Aff. of Amy P. Hennen ¶ 9, ECF 13-2). The court need not determine whether a tax sale occurred on May 17, 2017, however, as it is not relevant to the court's analysis.

In order to make these payments, Harris made withdrawals from her retirement account. (*Id.* ¶ 34). Seterus either did not respond to Harris's attempts to resolve this issue or reiterated that it would not adjust her account. (*Id.* ¶ 36).

Seterus, the servicer of the Harris Loan, was acquired by Nationstar in 2019. (Compl. ¶ 6). On March 1, 2019, Nationstar took over the servicing of the Harris Loan. (*Id.*). As part of the servicing transfer, Seterus provided to Nationstar all of its records related to the Harris Loan. (*Id.* ¶ 38). Harris continued her efforts to lower her monthly payments by corresponding with Nationstar. (*Id.* ¶ 39). On April 16, 2019, Harris, through counsel, sent to Nationstar a "Qualified Written Request/Notice of Error" ("QWR/NOE") explaining why she should not be subjected to "inflated" monthly payments on the Harris Loan. (*Id.* ¶ 39). On May 6, 2019, Nationstar responded, stating that "we are still unable to determine if any errors occurred on our part in regards to your concerns," and that "at this point in the investigation, only internal systems were used." (May 6, 2019, letter from Nationstar (d/b/a "Mr. Cooper"), ECF 9-4[5]; *see also* Compl. ¶¶ 41–42). On June 3, 2019, Harris received another letter from Nationstar, which stated that "[a]fter completing our investigation into the aforementioned issues we determined that overall, there were no errors on our part." (June 3, 2019, letter from Nationstar (d/b/a "Mr. Cooper"), ECF 9-5[6]; *see also* Compl. ¶ 43).

On June 11, 2019, Harris's counsel suggested to Nationstar that it confirm Harris's representations in the April 16, 2019, QWR/NOE through the City of Baltimore Law Department's Collection Group. (Compl. ¶ 44–45). Nationstar did not do so. (*Id.*). Nationstar

---

[5] While the May 6, 2019, letter is not attached to the Complaint, it is explicitly referenced, (*see* Compl. ¶¶ 41–42), and Harris does not appear to challenge its authenticity. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) ("[A] court may consider [a document not attached to the complaint] in determining whether to dismiss the complaint [if] it [is] integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.").
[6] *See supra* note 5.

sent another letter to Harris on June 25, 2019, which stated, in relevant part:

- The bill Seterus paid was for the Water in the amount of $18,953.62,[7] and payment posted on August 20, 2018
- The bill account number is 1100037362, which is showing as a condo, which is reflecting under Sharon Harris
- The delinquent water went to tax sale on June 11, 2018 and August 20, 2018 for unpaid water 2015, 2016, and 2017.

(June 25, 2019, letter from Nationstar (d/b/a "Mr. Cooper"), ECF 9-6[8]; Compl. ¶ 46). The June 25 letter further stated that Nationstar still needed to "reach the Water Department . . . to advise the payment was made on the incorrect parcel and was for the entire building. If this is in fact the case this could take up to 60 days for the correction to be made[.]" (ECF 9-6). The June 25 letter concluded, "[a]fter completing our investigation into the aforementioned issues we determined that overall, there were no errors on our part." (*Id.*).

Beginning in July 2019, Harris stopped paying the "inflated" monthly payments of $1,102.57, and instead returned to paying only $325.36 per month. (Compl. ¶¶ 53–54). Harris's July 2019 payment included a cover letter stating that "[b]ecause you and your predecessor have wrongfully imposed sums on my account . . . I am enclosing the correct sum due . . . Please apply it correctly to my account." (*Id.* ¶ 54). In correspondence to Harris, Nationstar has indicated that it would not apply her monthly payments to her account while she failed to make "full payments." (*Id.* ¶ 55). On August 6, 2019, Nationstar informed Harris that her loan was in default. (*Id.*).

Harris filed a four-count complaint in the Circuit Court for Baltimore City, which Nationstar removed to this court. (ECF 1). In Count I, Harris alleges that Seterus's and

---

[7] The parties do not explain why Lereta paid only $16,402.91 if $18,953.62 was the amount that appeared in their tax report. (*See* ECF 9-6 at 4 (Lereta Tax Status Report)). As the parties do not address it, the court need not resolve this discrepancy at this time.

[8] *See supra* note 5.

Nationstar's efforts to collect on an invalid debt violated the MCDCA and the MCPA. (Compl.

¶¶ 59–72).[9] In Count II, Harris alleges that Nationstar's failure to conduct a reasonable

investigation into the April 16, 2019, QWR/NOE, and failure to substantively respond to it,

violated RESPA and its implementing regulations. (*Id*. ¶¶ 73–77). In Count III, Harris alleges

that Seterus and Nationstar made false statements and omissions to her in violation of the

MMFPA. (*Id*. ¶¶ 78–87). In Count IV, Harris requests that the court issue a declaratory judgment

stating the amount she owes to Nationstar on the Harris Loan. (*Id*. ¶¶ 88–92).

## STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to

relief above the speculative level on the assumption that all the allegations in the complaint are

true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to

prove the elements of the claim. However, the complaint must allege sufficient facts to establish

those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

"Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is

'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to

plausible.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view

the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal

conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or

arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan*

---

[9] Within Count I, which is captioned as a claim for violations of MCDCA and MCPA, Harris also states that Seterus's and Nationstar's conduct violated the Federal Fair Debt Collection Practices Act ("FDCPA"). (Compl. ¶ 62). It is not clear, however, whether Harris intends to assert an additional FDCPA claim. *See infra* note 12.

*v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

### I.    MCDCA claim (Count I)

Count I includes an MCDCA claim against Nationstar and Seterus. The MCDCA makes it unlawful for a debt collector to "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202(8). The knowledge requirement of § 14-202(8) encompasses both actual knowledge and "reckless disregard as to the falsity of the information or the existence of the right." *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 595 (D. Md. 1999); *accord Kouabo v. Chevy Chase Bank, F.S.B.*, 336 F. Supp. 2d 471, 475 (D. Md. 2004).

Nationstar argues that Harris's MCDCA claim fails because, as a factual matter, Seterus's right to pay the outstanding water bill and seek reimbursement from Harris *did* exist. Nationstar points to the Deed of Trust on the Harris Loan, which, requires Harris to "promptly discharge any lien which has any priority over" the Deed of Trust; authorizes the Lender to "pay[] any sums secured by a lien which has priority over" the Deed of Trust; and provides that the Lender may pay amounts to satisfy a lien, and then seek reimbursement from the Borrower" (i.e. Harris). (Deed of Trust, ¶¶ 3, 4, 9, ECF 9-2). But Harris alleges that she was responsible for only half of the outstanding water bill ($16,900.89), as there was one water bill for the duplex, a contention supported by the fact that the Mayor and City Council of Baltimore instituted a civil action against *both* Harris and Stoops for the unpaid amounts. (*See* Case No. 010100233722017 (Balt. Cty. Cir. Ct. Sept. 25, 2017)). By the time Lereta, Seterus's vendor, redeemed the tax sale certificate on August 20, 2018, Harris and Stoops had already settled the case with the City. (*Id.*

(noting dismissal of the case on January 4, 2018); *see also* Compl. ¶¶ 27–28). As alleged in the Complaint, "[s]ubsequent to the settlement, Ms. Harris timely honored her obligations under the Settlement Agreement and made the required payments[.]" (Compl. ¶ 27). According to Harris, then, Seterus/Nationstar violated the MCDCA because Seterus made the $16,402.91 payment and sought reimbursement from her based on a right that *did not* exist (or, at least, no longer existed when Seterus made the payment).

Nationstar counters that "Plaintiff never alleges that Defendant was aware of either (a) her contentions regarding the impropriety of the City's water bill to her; or (b) her settlement agreement with the City, either at or before the time that Defendant issued payment to the City to resolve the outstanding water bill and tax sale certificate." (Mot. at 4, ECF 9-1). As explained above, however, "reckless disregard as to . . . the existence of the right" suffices under the MCDCA knowledge requirement. *Spencer,* 81 F. Supp. 2d at 595. In *Kouabo*, even though the defendants "did not have actual knowledge that they had no right to seek enforcement" of the plaintiff's settlement agreement with the bank to which he owed money, the court observed that the defendants "acted out of the blue" in seeking to enforce the settlement and "never check[ed] with [the bank] as to the status of [the plaintiff's] payments[.]" 336 F. Supp. 2d at 476. "While the [] Defendants may have been acting based on information from [the bank's successor entity], that cannot insulate them from potential liability." *Id.*; *see also id*. at 473 n.2.

Here, the court finds that Harris has adequately alleged that Seterus/Nationstar acted recklessly in making a payment of $16,402.91 to the City without investigating whether Harris still owed that amount. Even assuming that on May 15, 2017, when the tax sale was advertised, Harris was responsible for the full amount of the outstanding water bill (which Harris contests), it would have been reasonable for Seterus to investigate whether that amount was still correct

when Seterus's vendor made the payment on August 20, 2018. The existence of the district court case against Harris and Stoops is public record, as is the fact that the case was dismissed pursuant to a settlement agreement. At a minimum, Seterus could have contacted Harris or the City before making the payment to ensure that the $16,402.91 payment was, in fact, necessary to protect its interest in the Harris Property, or was even still the correct amount. (*See* Compl. ¶ 30 (alleging that the payment was made "[w]ith no notice or inquiry to the Plaintiff or Baltimore City whatsoever")). Indeed, by August 2018, the amount Harris owed could have been higher (if, for example, she continued  not to pay the water bill) or lower (if she had already begun paying the City pursuant to the settlement, as she contends) than it was a year earlier, when the tax sale was advertised.

The court finds that Seterus/Nationstar's alleged failure to take any steps to confirm that Harris still, in fact, owed $16,402.91 to the City suffices to show recklessness under the MCDCA. Accordingly, Nationstar's motion to dismiss the claim will be denied. To the extent, however, that Harris seeks to add a claim that Seterus's reliance on "an unlicensed professional's conduct, i.e. Lereta, as part of its collection practices" also violated MCDCA, (*see* Opp'n at 13), this claim will not be considered, as it does not appear in the Complaint. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984); *accord Gray v. Unidentified Metro Transit Police Officers 1, 2, 3*, No. CV DKC 14-2939, 2017 WL 528429, *3 n. 5 (D. Md. Feb. 9, 2017).[10]

---

[10] Unpublished opinions are cited for the soundness of their reasoning rather than for any precedential value.

## II.    MCPA claim (Count I)

Count I also includes allegations that Nationstar and Seterus violated the MCPA. (Compl.

¶¶ 64–72). The MCPA "prohibits unfair or deceptive trade practices, including in connection

with the collection of consumer debts." *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 780

(4th Cir. 2013) (citing Md. Code Ann., Com. Law § 13-301). Unfair or deceptive trade practices

include, *inter alia*, violations of the MCDCA. *See* Md. Code Ann., Com. Law § 13-301(14)(iii).

As Harris's MCDCA claim will proceed, her MCPA claim will proceed as well.[11, 12]

## III.    RESPA/Regulation X claim (Count II)

In Count II, Harris alleges that Nationstar violated RESPA, 12 U.S.C. § 2605, and

implementing regulations 12 C.F.R. §§ 1024.35 and 1024.36 ("Regulation X"[13]) by failing to

conduct a reasonable investigation of the April 16, 2019, QWR/NOE, and by failing to

substantively respond to it. Under RESPA, the servicer of a federally related mortgage loan must

acknowledge receipt of a qualified written request ("QWR") within five business days of receipt.

12 U.S.C. § 2605(e)(1)(A).[14] "Thereafter, within thirty business days, the servicer must: (1)

make corrections to the borrower's account; (2) after conducting an investigation, provide a

written explanation stating the reasons the servicer believes the account is correct; or (3) conduct

---

[11] Nationstar argues that MCPA claims are subject to the heightened pleading standards under Rule 9(b). (Mot. at 11). While this is true for *some* alleged violations of the MCPA, "the provisions barring unfair and deceptive practices need not be alleged with particularity." *Gillis v. Household Fin. Corp. III*, No. GJH-18-3923, 2019 WL 3412621, at *9 (D. Md. July 29, 2019) (citing *McCormick v. Medtronic, Inc*., 219 Md. App. 485 at 529–30 (2014)) (further citations omitted). As Harris has adequately alleged an MCDCA claim, which is defined by statute as an "[u]nfair, abusive, or deceptive trade practice[]," Md. Code Ann., Com. Law § 13-301(14)(iii), she need not satisfy the heightened pleading standard to state an MCPA claim.

[12] As noted *supra* note 9, it is not clear whether Harris intends to assert an additional FDCPA claim. Nationstar states in the motion to dismiss that Harris alleges "unspecified violations of the federal Fair Debt Collection Practices Act," but doesnot further argue for dismissal of that claim (if it exists). Accordingly, any FDCPA claim will not be dismissed at this time, and Count I will proceed in its entirety.

[13] RESPA's current implementing regulations, codified at 12 C.F.R. § 1024, are collectively referred to as "Regulation X." *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 799 (E.D. Pa. 2014).

[14] Nationstar does not contest that Harris's April 16, 2019 letter constituted a QWR within the meaning of RESPA. *See* 12 U.S.C. § 2605(e)(1)(B) (defining "qualified written request").

11

an investigation and provide the information requested by the borrower or an explanation of why

the information is unavailable." *Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 417 (D. Md.

2018) (citing 12 U.S.C. § 2605(e)(2)). Regulation X further provides that the servicer must

respond to a QWR either by correcting the error identified by the borrower, or by

> Conducting a *reasonable investigation* and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, *a statement of the reason or reasons for this determination*, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i) (emphases added).

Nationstar argues that Count II should be dismissed on the basis that Nationstar complied

with its obligations under RESPA, as evidenced by the May 6, 2019, June 3, 2019, and June 25,

2019, responses to the April 16, 2019, QWR/NOE. (Mot. at 14–15). According to Nationstar,

"[a]ll that is required is that Defendant investigate the inquiry and provide Plaintiff with a written

statement of the reasons for which Defendant believes the account to be correct." (*Id.* at 15).

Nationstar's recitation of its obligations under RESPA, however, is incomplete. Prior to the

promulgation of Regulation X in 2014, RESPA

> required nothing more than "an investigation" and a "written explanation" that the servicer believes supports its determination that the account is correct. . . . Regulation X, however, altered the landscape of those obligations. For example, in response to a [QWR], a servicer must now conduct a "reasonable investigation." The addition of the word "reasonable" seemingly imposes a substantive obligation that is not satisfied by the mere procedural completion of some investigation followed by a written statement of reasons.

*Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014) (collecting cases).

According to the Complaint, the April 16, 2019, QWR/NOE explained why Harris

believed her inflated monthly mortgage payments were incorrect and included supporting

documentation. (Compl. ¶ 39). Nationstar's May 6, 2019, response stated that its Escrow

Department was researching Harris's "concerns . . . in regards to Seterus, Inc., issuing an invalid

tax payment on behalf of [Harris]." (ECF 9-4). Nationstar's June 3, 2019, letter stated that "[t]he

tax office was unable locate the amount paid for the water bill in question. However, we are still

attempting to contact the water company to clarify the settlement agreement mentioned in your

correspondence." (ECF 9-5). Nationstar further stated that there was a delay in the researching of

Harris's concerns because the Baltimore Independent City systems were down, and that "[w]e

apologize for any inconvenience this delay may cause, please know that we are working

diligently to research your concerns and will provide you a response as soon as we are able."

(*Id.*). Puzzlingly, however, in the next sentence, Nationstar asserted that "[a]fter completing our

investigation into the aforementioned issues we determined that overall, there were no errors on

our part." (*Id.*). The June 3 letter does not explain what kind of investigation was conducted, or

why it determined that it had made no errors, but does state that Nationstar based its conclusion

on documents from its "internal system." (*Id.*). While the June 25, 2019, letter goes into more

detail about Nationstar's investigation, it does not fully respond to Harris's concerns about

inflated monthly charges based on an allegedly invalid tax payment. (*See* ECF 9-6).

In fact, based on the text of the letter, it appears that Nationstar concluded "there were no errors

on our part" even before confirming that "the payment was made on the incorrect parcel and was

for the entire building." (*Id.*).

Harris's allegations pertaining to the unreasonableness of Nationstar's investigation

center on Nationstar's apparent exclusive reliance on its "internal system" in determining that it

had made "no errors." (Compl. ¶¶ 41–42). Nationstar argues that Harris's claim of an

unreasonable investigation is contradicted by the May 6, 2019, June 3, 2019, and June 25, 2019,

responses to the April 16, 2019, QWR/NOE. (*See* Reply at 16, ECF 14). The court disagrees.

Nationstar's responses to the QWR/NOE shed little light on the reasonableness of the

investigation and, as noted above, suggest that Nationstar concluded it had made no errors even

before it could confirm certain details with the City of Baltimore. (*See* ECF 9-5, 9-6). The court

finds that Harris has adequately pled violations of RESPA and Regulation X based on the lack of

a reasonable investigation. *See Wilson*, 48 F. Supp. 3d at 805 n.3 (denying the defendant's

motion to dismiss where "[t]he Court . . . cannot determine, based solely on the attached letters

and in the absence of discovery, whether Defendant's investigation was 'reasonable' for

purposes of RESPA").

Harris has also adequately pled violations of RESPA and Regulation X based on

Nationstar's failure to substantively respond to the April 16, 2019, QWR/NOE. A servicer

violates Regulation X where "the substance of [the servicer's] letter [in response to a QWR] fails

to clarify how [the servicer] made its determination that no error occurred." *Lage v. Ocwen Loan

Servicing LLC,* 145 F. Supp. 3d 1172, 1190–91 (S.D. Fla. 2015), *aff'd*, 839 F.3d 1003 (11th Cir.

2016*); see also Denton v. Nationstar Mortg. LLC*, No. 18-CV-241-GKF-JFJ, 2020 WL 1919133,

at *8 (N.D. Okla. Apr. 20, 2020) ("Even if Seterus had an explanation . . . it failed to explain

[it.]"). The court again observes that Nationstar twice concluded that it made no errors even

before completing its investigation into Harris's concerns. (*See* ECF 9-5, 9-6). Even Nationstar's

most detailed letter—the June 25, 2019, letter—merely reiterates that Seterus paid a water bill

associated with "account bill account number is 1100037362, which is showing as a condo,

which is reflecting under Sharon Harris." (*See* ECF 9-6). Presumably, Harris already knew this.

*Cf. Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 724 (S.D. Ohio 2014) ("[W]here, as

here, a borrower alleges that payments have been misapplied and her account has been

incorrectly charged fees, it clarifies and explains nothing for the servicer to simply send the borrower new copies of documents she probably already has showing that the fees were indeed charged and the payments unallocated."). Accordingly, Nationstar's motion to dismiss Count II will be denied.[15]

## IV.    MMFPA claim (Count III)

In Count III, Harris alleges that Nationstar and Seterus violated the MMFPA by making "knowingly deceptive and untrue communications and misstatements and omissions and acts and omissions in the mortgage lending process[.]" (Compl. ¶ 87). "The MMFPA prohibits mortgage fraud during the mortgage lending process," *Barr,* 303 F. Supp. 3d at 416 (citing Md. Code Ann., Real Prop. § 7-401(d)), including during the servicing of the loan, Md. Code Ann., Real Prop. § 7-401(e)(2)(i). "[C]ourts addressing MMFPA claims have indicated . . . that in order to state a MMFPA claim, plaintiffs must plead the elements of a common law fraud claim." *Galante v. Ocwen Loan Servicing LLC*, No. CIV.A. ELH-13-1939, 2014 WL 3616354, at *28 (D. Md. July 18, 2014) (collecting cases). In Maryland, a plaintiff alleging common law fraud must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Id*. (quoting *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc*., 398 Md. 529, 544 (2007) (quotation marks and citation omitted) (further citations omitted).

Harris's MMFFA claim fails because she does not adequately allege that any false

---

[15] It is not clear from the Complaint whether Count II also includes a RESPA/Regulation X claim based on failure to timely respond to a QWR. Moreover, Harris asserts that "Defendants move to *partially* dismiss Harris' RESPA and Regulation X claims," (Opp'n at 20 (emphasis added)), a characterization Nationstar calls "demonstrably incorrect," (Reply at 18). But as the court will deny Nationstar's motion as to Count II, it need not resolve these issues at this time.

representations were made *for the purpose* of defrauding her. Harris suggests that her allegations pertaining to "the Defendants' willful refusal to know the true facts" suffice to show intent to defraud. (Opp'n at 26; Compl. ¶¶ 86–87). The court disagrees. Even assuming that Nationstar and/or Seterus was recklessly indifferent to the truth or falsity of the representations made to Harris, that does not necessarily mean that allegedly false representations were made with the purpose to defraud. *See Gillis v. Household Fin. Corp. III*, No. GJH-18-3923, 2019 WL 3412621, at *10 (D. Md. July 29, 2019) ("Although Plaintiffs have alleged that each Defendant knowingly made misrepresentations or omissions about the subject loan, they have failed to allege particular facts showing that Defendants intended to defraud Plaintiffs."). As Harris's Complaint does not contain specific, non-conclusory allegations that Seterus or Nationstar intended to defraud her, Count III will be dismissed.

## V.    Declaratory judgment (Count IV)

Nationstar's argument that Harris is not entitled to any declaratory judgment is premised on its belief that she fails to state any claims. As Counts I and II will proceed, however, the court will not dismiss Count IV.

## CONCLUSION

For the foregoing reasons, Nationstar's motion to dismiss (ECF 9) will be granted in part and denied in part. Count III will be dismissed, and Counts I, II, and IV will proceed. A separate order follows.


_____8/13/20_____                          _____/S/_____
Date                                            Catherine C. Blake
                                                United States District Judge